[L.A. No. 30971. Apr. 11, 1979.]

JULIA ANN SALAS, Plaintiff and Respondent, v.
MIGUEL MARTINEZ CORTEZ, Defendant and Appellant.

DAVID M., a Minor, etc., et al., Plaintiffs and Respondents, v.
DAVID DURAN CASTELLANOS, Defendant and Appellant.

COUNSEL

Richard A. Weinstock, John A. Lefcourte, Robert Guerra, Manuel Jose Covarrubias and Stephen P. Wiman for Defendants and Appellants.

James O. Barney, George Chaffey, Rosalyn M. Chapman, Erica Hahn and Joseph Charney as Amici Curiae on behalf of Defendants and Appellants.

Evelle J. Younger, George Deukmejian, Attorneys General, Jack R. Winkler, Robert H. Philibosian, Chief Assistant Attorneys General, S. Clark Moore, Assistant Attorney General, Lawrence P. Scherb II, Andrew D. Amerson, Pamela Nelson and Norman H. Sokolow, Deputy Attorneys General, for Plaintiffs and Respondents.

OPINION

BIRD, C. J.—In these consolidated appeals, this court must decide whether due process requires the appointment of counsel to represent indigent defendants in law suits brought at the behest of the state to determine the parentage of minor children.

I

SALAS v. CORTEZ

Julia Salas, the mother of a child born out of wedlock, received welfare benefits from Ventura County under the Aid to Families with Dependent Children (AFDC) program. Suit was filed in order to (1) establish that Miguel Martinez Cortez was the father of the child and (2) obtain child support. The Ventura County District Attorney represented Mrs. Salas in this action.

After appellant was personally served, he answered the complaint in propria persona, denying all allegations. The district attorney then sent appellant a seven-page set of interrogatories. When the district attorney

moved to compel answers to these interrogatories, appellant requested court-appointed counsel. A declaration, prepared with the assistance of the Ventura County Legal Aid Association, was submitted by appellant denying he was the father of the child. He further declared that he could not speak, read or write English and, therefore, did not understand the numerous documents filed by the district attorney. Although presently an unemployed farm worker, ordinarily he earned about $400 per month to support his wife and their two children. Unable to afford the $500 requested by private counsel, appellant made several unsuccessful efforts to obtain free counsel from the Ventura County Legal Aid Association and the California Rural Legal Assistance Foundation. Although he qualified for their services, both organizations informed him that they had insufficient staff to handle any more paternity and child support cases. Counsel was not appointed by the court.

At a subsequent hearing, an interpreter was appointed and appellant was ordered to answer the district attorney's interrogatories. Subsequently the district attorney served a request for admissions pursuant to Code of Civil Procedure section 2030, asking appellant to admit "That defendant is the father of [the child]," and that "defendant is able to pay child support in the amount of seventy-five dollars ($75.00) for support of [the child] . . . ." Neither the interrogatories nor the district attorney's request for admissions was answered. The district attorney warned appellant that he intended to obtain a judgment based on the unanswered request for admissions.

Appellant did not appear for trial on May 12, 1976. The child's mother testified briefly and the statements in the unanswered request for admissions were deemed admitted. (Former Code Civ. Proc., § 2030, subd. (e)(2); see Code Civ. Proc., § 2033, subd. (a).) Appellant was found to be the father of the child and was ordered to pay $75 per month child support and $300 for past support. Payments were to be made through the district attorney's office. This appeal and the designation of the record were filed on appellant's behalf by the Ventura County Legal Aid Association.

### DAVID M. V. CASTELLANOS

David M., born out of wedlock, brought an action through his guardian ad litem, a family support officer in the Ventura County District Attorney's office, to declare appellant to be his father and to secure child support from him. The County of Ventura also sought reimbursement for

support which it had already provided to the minor. The minor and the county were represented by the district attorney.

After he was personally served, appellant answered in propria persona, denying all allegations, and requested court-appointed counsel. The Ventura County Legal Aid Association filed on his behalf a motion for appointment of counsel with points and authorities in support of the motion. Appellant declared that as an unemployed laborer he could not afford the fees of $500 to $1,000 of private counsel. The public defender declined to represent him because the action was civil in nature, and the Ventura County Legal Aid Association informed appellant that they no longer represented defendants in such cases although they would assist him in preparing a defense.[1] The court denied appellant's request for counsel.

Subsequently, interrogatories and a request for admissions were served on appellant, but went unanswered. Appellant did not appear for trial on June 9, 1976, and the matter was submitted on the unanswered request for admissions and testimony of the child's mother. This testimony had been given at an earlier hearing on a motion for temporary child support at which appellant was not present. On this record, appellant was found to be the father of the child, ordered to pay $50 per month child support, and $1,214 for past support. These monies were payable through the district attorney's office. The Ventura County Legal Aid Association filed the notice of appeal and designation of the record on appeal.

## II

These consolidated cases present a narrow question: Are indigent defendants in paternity proceedings prosecuted by the state constitutionally entitled to appointed counsel?

The Fourteenth Amendment to the United States Constitution and article I, section 7, subdivision (a) of the California Constitution ensure that an individual may not be deprived of life, liberty or property

---

[1] The executive director of the Ventura County Legal Aid Association further declared that his office employs 7 attorneys and represents approximately 3,000 persons a year in diverse areas of civil law. He stated that this office represents 10 defendants in paternity actions, that filings by the Ventura County District Attorney in paternity and civil support actions had greatly increased as a result of federal funding, that his office had become involved in a disproportionate number of such actions to the detriment of their representation of other indigent civil litigants. Accordingly, he instructed the attorneys in his office not to accept any new paternity or support cases. Consequently, his office was unable to represent appellant.

without due process of law. Central to this constitutional right is the guarantee that "absent a countervailing state interest of overriding significance, persons forced to settle their claims of right and duty through the judicial process must be given a meaningful opportunity to be heard." (*Boddie* v. *Connecticut* (1971) 401 U.S. 371, 377 [28 L.Ed.2d 113, 118, 91 S.Ct. 780]; *Payne* v. *Superior Court* (1976) 17 Cal.3d 908, 914 [132 Cal.Rptr. 405, 553 P.2d 565].) This has been held to include the right of a defendant to appointed counsel under certain circumstances, regardless of whether the action is labelled criminal or civil. (*In re Gault* (1967) 387 U.S. 1 [18 L.Ed.2d 527, 87 S.Ct. 1428]; *Specht* v. *Patterson* (1967) 386 U.S. 605, 608-610 [18 L.Ed.2d 326, 329-331, 87 S.Ct. 1209].) For example, where the deprivation the defendant faces is significant and the facts are complex, due process has been held to include the right of an indigent defendant to appointed counsel in certain civil proceedings. (*In re Love* (1974) 11 Cal.3d 179, 186, 190-191 [113 Cal.Rptr. 89, 520 P.2d 713] [parole revocation]; *Cleaver* v. *Wilcox* (9th Cir. 1974) 499 F.2d 940, 944-945 [juvenile dependency proceedings]; see also *Reynolds* v. *Kimmons* (Alaska 1977) 569 P.2d 799 [paternity proceedings]; *Artibee* v. *Cheboygan Circuit Judge* (1976) 397 Mich. 54 [243 N.W.2d 248] [paternity proceedings].)

The touchstone of due process is fundamental fairness. Whether due process requires the appointment of counsel in a particular case depends on the interests involved and the nature of the proceedings. ■ ■ ■ (*In re Love, supra,* 11 Cal.3d at p. 190, fn. 11; see also *In re Jacqueline H.* (1978) 21 Cal.3d 170, 175-177 [145 Cal.Rptr. 548, 577 P.2d 683].)[2] ■ To determine the weight of appellants' claims to appointed counsel in the present cases, this court must examine the nature and magnitude of the interests involved, the possible consequences appellants face and the features which distinguish paternity proceedings from other civil proceedings. These factors must then be balanced against the state's interests.

The cases before this court involve more than monetary judgments. They were brought under statutory authority to declare the existence of

---

[2] The dissent's reliance on *Scott* v. *Illinois* (1979) 440 U.S. 367 [59 L.Ed.2d 383, 99 S.Ct. 1158] is misplaced. *Scott* is not the law in California. In this state, a person charged with a misdemeanor has a right to counsel regardless of whether a jail term actually is, or even could be, imposed. (*Tracy* v. *Municipal Court* (1978) 22 Cal.3d 760, 766 [150 Cal.Rptr. 785, 587 P.2d 277]; *Mills* v. *Municipal Court* (1973) 10 Cal.3d 288, 301 [110 Cal.Rptr. 329, 515 P.2d 273].) Further, *Scott* does not even tangentially address the issue before this court, but is solely concerned with the right to counsel in misdemeanor proceedings.

the most basic biological relationship, that of parent and child. (Welf. & Inst. Code, §§ 11350.1, 11475.1; Civ. Code, §§ 7001, 7006; cf. *Boddie* v. *Connecticut, supra,* 401 U.S. at p. 383 [28 L.Ed.2d at p. 122].) A determination of paternity has grave implications for all concerned—the alleged father, the child, the mother and the state. This court has termed the interest in maintaining a parent-child relationship "a compelling one, ranked among the most basic of civil rights . . . ." (*In re B. G.* (1974) 11 Cal.3d 679, 688 [114 Cal.Rptr. 444, 523 P.2d 244]; *Cleaver* v. *Wilcox, supra,* 499 F.2d at p. 945.) Freedom from an incorrect imposition of that relationship on either a parent or a child is an equally compelling interest.

An adjudication of paternity may profoundly affect a person's life. It may disrupt an established family and damage reputations. Further, a court's determination of paternity exposes a defendant to deprivation of property and, potentially, liberty. It entails the obligation to support and educate a child (Civ. Code, §§ 196a, 7012), an obligation that does not end at the child's age of majority. (Civ. Code, § 206.)[3] Moreover, a child support order is more freely enforceable by garnishment than an ordinary civil judgment (15 U.S.C. § 1673(b)(1); Int. Rev. Code, § 6103(*l*)(6); Code Civ. Proc., § 690.6), and is not dischargeable in bankruptcy (11 U.S.C. § 35(a)(7)). Also, the failure to pay child support may be enforced through the civil contempt power (Civ. Code, § 7012), as well as the Uniform Civil Liability Act (Civ. Code, § 241 et seq.) and interstate assistance statutes (42 U.S.C. §§ 651-655; Code Civ. Proc., § 1650 et seq.). A judgment of paternity, even if taken by default, is res judicata in any subsequent civil enforcement proceeding. (Civ. Code, § 7010, subd. (a).)

Failure to support a child may also be prosecuted criminally. (Pen. Code, § 270.)[4] While an indigent is entitled to counsel if prosecuted

---

[3]The consequences of a paternity judgment also reach beyond the grave—the child will succeed to the estate of the father if he dies intestate (Prob. Code, §§ 221, 222, 255), or share in the father's estate by will unless affirmatively excluded (Prob. Code, §§ 90, 91).

[4]Penal Code section 270 states in pertinent part:

"If a parent of a minor child willfully omits, without lawful excuse, to furnish necessary clothing, food, shelter or medical attendance, or other remedial care for his or her child, he or she is guilty of a misdemeanor punishable by a fine not exceeding one thousand dollars ($1,000), or by imprisonment in the county jail not exceeding one year, or by both such fine and imprisonment. If a court of competent jurisdiction has made a final adjudication in either a civil or a criminal action that a person is the parent of a minor child and the person has notice of such adjudication and he or she then willfully omits, without lawful excuse, to furnish necessary clothing, food, shelter, medical attendance or other remedial care for his or her child, this conduct is punishable by imprisonment in the county jail not exceeding one year or in a state prison not exceeding one year and one day, or by a fine not exceeding one thousand dollars ($1,000), or by both such fine and

criminally for nonsupport, the most significant element of the offense —paternity—may have already been determined in a civil proceeding in which the defendant was unrepresented by counsel. ██ The prior civil judgment is admissible in criminal proceedings for nonsupport. (Pen. Code, § 270e.)[5]

Although in the past a paternity suit was a private affair between a mother and the man she named as the father of her child, in recent years the state has assumed a greater role in bringing suits to determine parentage. (Gliaudys, *Paternity: A Reluctant Fatherhood* (1978) 53 State Bar J. 318.) Amendments to the Social Security Act which were passed in 1974 encouraged district attorneys to bring actions on behalf of minor children against absent parents to determine paternity and secure financial support. (42 U.S.C. § 651 et seq.) Those amendments appropriated federal funds "[f]or the purpose of enforcing the support obligations owed by absent parents to their children, locating absent parents, establishing paternity, and obtaining child support . . . ." (42

imprisonment. This statute shall not be construed so as to relieve such parent from the criminal liability defined herein for such omission merely because the other parent of such child is legally entitled to the custody of such child nor because the other parent of such child or any other person or organization voluntarily or involuntarily furnishes such necessary food, clothing, shelter or medical attendance or other remedial care for such child or undertakes to do so.

" . . . . . . . . . . . . . . . . . .

"The court, in determining the ability of the parent to support his or her child, shall consider all income, including social insurance benefits and gifts.

"The provisions of this section are applicable whether the parents of such child are or were ever married or divorced, and regardless of any decree made in any divorce action relative to alimony or to the support of the child. A child conceived but not yet born is to be deemed an existing person insofar as this section is concerned."

[5] Penal Code section 270e states: "No other evidence shall be required to prove marriage of husband and wife, or that a person is the lawful father or mother of a child or children, than is or shall be required to prove such facts in a civil action. In all prosecutions under either Section 270a or 270 of this code, Sections 970, 971, and 980 of the Evidence Code do not apply, and both husband and wife shall be competent to testify to any and all relevant matters, including the fact of marriage and the parentage of a child or children. Proof of the abandonment and nonsupport of a spouse, or of the omission to furnish necessary food, clothing, shelter, or of medical attendance for a child or children is prima facie evidence that such abandonment and nonsupport or omission to furnish necessary food, clothing, shelter or medical attendance is willful. In any prosecution under Section 270, it shall be competent for the people to prove nonaccess of husband to wife or any other fact establishing nonpaternity of a husband. *In any prosecution pursuant to Section 270, the final establishment of paternity or nonpaternity in another proceeding shall be admissible as evidence of paternity or nonpaternity.*" (Italics added.)

A prior civil judgment is not res judicata on the issue of paternity because of the higher standard of proof in criminal cases. (*Patterson* v. *Municipal Court* (1965) 232 Cal.App.2d 289, 302 [42 Cal.Rptr. 769].) This appears to be the only instance where a civil judgment is admissible in a criminal proceeding for the truth of the matters stated in that civil judgment. (See Jefferson, Cal. Evidence Benchbook, § 9.1, pp. 125-128.)

U.S.C. § 651.) Each state receiving federal funds for AFDC was required to adopt a plan for enforcing such obligations, and reimbursement was provided by the federal government for 75 percent of certain expenses involved in such enforcement activity. (42 U.S.C. §§ 654, 655.)

California enacted new legislation to conform to federal law. (Stats. 1975, ch. 924, §§ 1-24, pp. 2030-2042.) As a condition of receiving AFDC, the parent receiving aid must now assign to the county any rights to support from any other person and must cooperate in establishing the paternity of a child born out of wedlock for whom aid is claimed. (Welf. & Inst. Code, §§ 11475.1, 11476.) The district attorney is authorized to bring an action on behalf of either the mother (as in *Salas* v. *Cortez*), the minor child (as in *David M.* v. *Castellanos*), or the county to determine parentage and enforce support. (Welf. & Inst. Code, § 11350.1.) While these services are voluntarily provided to all custodial parents, such suits are *mandatory* where the custodial parent is receiving welfare payments. Under this scheme, the present appellants were at a distinct disadvantage in facing the severe consequences of a paternity judgment. Unlike the ordinary civil litigant, appellants were opposed by the full resources of the state, marshalled on the plaintiffs' behalf. Pursuant to a state and federal statutory scheme, designed to enforce the support obligations of absent parents, plaintiffs were represented by the district attorney. Further, these actions were prosecuted at public expense. (Welf. & Inst. Code, § 11475 et seq.; 42 U.S.C. § 651 et seq.)

In the present cases, all the responsibilities of fatherhood were imposed by the state on men who were unable to secure the assistance of counsel because they were indigent. Each appellant made a diligent effort to obtain counsel. Both were ignorant of the intricacies of civil practice and one appellant was not even fluent in the English language. Without the assistance of counsel, neither was in a position to respond adequately to the district attorney's discovery requests nor to initiate discovery himself. Without the assistance of counsel, neither was able to procure the assistance of experts to perform blood group tests which might conclusively have exonerated him.[6] Each was found to be the father of a child on

---

[6]If mother, child, and alleged father are tested using all three of the most common blood group tests, the ABO, Rh and MNSs systems, there is a 55 percent probability that an innocent man will be excluded by at least one of the tests. If four other tests are also used, the probability rises to 92 percent. Use of the HLA tissue typing system alone provides a 78 percent probability of exclusion of an innocent father. (*Joint AMA-ABA Guidelines: The Present Status of Serologic Testing in Problems of Disputed Parentage* (1976) 10 Fam.L.Q. 247, 257-258.) Under California law, if it is the conclusion of all the experts that the blood tests exclude an alleged father, the issue of paternity must be resolved accordingly. (Evid. Code, § 895.)

the basis of (1) alleged facts which were deemed admitted because not contradicted, and (2) testimony of the mother which was not subjected to cross-examination.[7] In short, without the assistance of counsel, neither appellant was able to defend against the allegations of the complaint. As a result, each was named the father of a child by involuntary default.

A judgment rendered in this manner is not only unfair, it is unreliable. Recognizing the complexity of these proceedings and the importance of their outcome to the state, the mother and the child, the Legislature has afforded the mother and child the assistance of counsel in prosecuting their claim. However, by intervening heavily on behalf of one side in what has traditionally been a private dispute, the state has skewed the outcome of the case. The chances that the significant consequences of fatherhood will be imposed on an innocent man obviously increase dramatically if, because he is unable to afford counsel, the defendant offers no defense. They increase still further if counsel for the plaintiff is a specialist in prosecuting such claims. (See Gliaudys, *supra,* 53 State Bar J. at p. 324.) Unless the rights of indigent paternity defendants are protected, courts risk finding not the right man, but simply the poorest man to be the father of a child.[8] If paternity is to be determined in an adversary proceeding at the behest of the state, surely the interests of all concerned demand that the defendant be able to defend fully and fairly. He cannot do so when his indigency prevents him from obtaining counsel. (*Ibid.*; Krause, *supra,* at pp. 111-112; cf. *Griffin* v. *Illinois* (1956) 351 U.S. 12, 19 [100 L.Ed. 891, 76 S.Ct. 585, 55 A.L.R.2d 1055].)

Respondents argue that appellants are not entitled to appointed counsel because they are no different than the ordinary civil litigant and their only interest in the present proceedings is financial. They have been

---

[7]There are many reasons why the man named by a mother as the father of her child may not necessarily be the father. She may simply not know which of several possible men is in fact the father. Additionally, she may wish to protect the actual father or protect herself from retribution from him. (See generally, Poulin, *Illegitimacy and Family Privacy* (1976) 70 Nw.U.L.Rev. 910, 923-924.) Since cooperation with the district attorney is mandatory for women receiving AFDC, a mother may also simply supply a name in order to avoid termination of welfare benefits. (Gliaudys, *supra,* 53 State Bar J. at p. 322.) Further, studies have shown that much testimony regarding the parties' sexual contacts in paternity suits is unreliable. (See Krause, Illegitimacy: Law and Social Policy (1971) pp. 107-108.)

[8]For example, prior to filing suit against appellant in *David M.* v. *Castellanos,* the district attorney brought a suit on behalf of the same minor child against another man. That man secured counsel, and a request for temporary support was denied for lack of evidence. Suit was then filed against Mr. Castellanos, alleging that *he* was the father of the child. Mr. Castellanos did not attend the hearing on temporary support and was found to be the child's father partially on the basis of testimony given at that hearing.

afforded an opportunity to appear and defend, unlike the defendant in *Payne* v. *Superior Court, supra,* 17 Cal.3d 908, and the would-be litigants in *Boddie* v. *Connecticut, supra,* 401 U.S. 371. Therefore, it is contended that there has been no denial of due process. It is argued that if appellants are entitled to court-appointed counsel, then counsel would have to be appointed for indigent defendants in every civil case. However, the present cases are not ordinary civil actions. Unlike other civil actions, even those in which the state is a party, in these cases the full power of the state is pitted against an indigent person in an adjudication of the existence of a fundamental biological relationship entailing serious financial, legal and moral obligations. Thus, appellants' entitlement to counsel turns on whether the state has a compelling interest that would justify its insistence on denying appellants a fair opportunity to defend.

The state's interest in determining parentage has traditionally been limited to preventing children born out of wedlock from becoming public charges. (See An Act for Setting the Poor on Work (1576) 18 Eliz. 1, ch. 3, § 2, quoted in Krause, *supra,* at pp. 105-106.) The amendments to federal law which gave rise to the present cases were brought about by concerns similar to those that inspired the Elizabethan Poor Laws—the increasing appearance on the welfare rolls of children born out of wedlock. (See Note (1976) 52 Wash.L.Rev. 169, 170.) In recent years nearly half of the families receiving AFDC have had at least one child born out of wedlock. (*Id.,* at p. 177.) Were the state able to recover from absent parents even a portion of the funds expended through the AFDC program, the savings would be substantial. (See *id.,* at p. 172.)

It is clearly within the power of the state to provide for the enforcement of the parental duty to support one's children. The state may further legitimately provide for the expenditure of public funds to assist custodial parents in enforcing the support obligations of absent parents, whether or not the custodial parent is receiving public assistance. Such efforts are a laudable attempt to prevent custodial parents, the overwhelming majority of whom are women, from having to bear alone the full burden of a mutual decision to engage in sexual relations.[9] However, the legitimacy of this state interest is not at issue here. The issue is simply whether there

---

[9] The problem of nonsupport is by no means restricted to children born out of wedlock or even to the poor. A study which Congress evidently relied upon in enacting the 1974 amendments to the Social Security Act reported that one year after the divorce decree only 38 percent of fathers were in compliance with support orders and 42 percent made no payment at all. By the 10th year after divorce the percentage of fathers no longer paying any child support had risen to 79 percent. Many of these fathers earned over $25,000 per year. (Note, *supra,* 52 Wash.L.Rev. at pp. 172-173.)

is any state interest sufficiently compelling to warrant depriving an indigent defendant of counsel at the time the crucial determination is made that he is legally to be considered a child's father.

The state's interest in denying counsel to indigent paternity defendants is largely financial. Respondents argue it will require a greater expenditure of public funds if indigent defendants, as well as plaintiffs, are represented at public expense. In addition, it may become more difficult to identify potential fathers and establish paternity if defendants have the full benefits of the adversary system. However, the state has no legitimate interest in incorrectly ascribing parentage and imposing the obligations of fatherhood on someone other than the child's actual father. Appointment of counsel for indigent defendants will make the fact-finding process in paternity cases more accurate, thereby furthering the state's *legitimate* interests in securing support for dependent children.

Appointment of counsel need not lead to protracted litigation. It may also increase the likelihood that the man who is judicially determined to be a child's father will provide support. A man would seem to be less likely to voluntarily pay child support if the determination of paternity were rendered in a proceeding in which he did not participate and was not represented. Faced with strong scientific evidence of paternity, many defendants arrive at a settlement with the district attorney without the expense of a trial. (See Gliaudys, *supra,* 53 State Bar J. at pp. 319-322.) Further, it should be noted that recoupment of the cost of appointed counsel is possible if it is determined at the conclusion of the proceedings that the defendant has sufficient means. (Gov. Code, § 27712.) If the accuracy and fairness of paternity suits are improved by providing representation for indigent defendants, in the long run the state will actually further its legitimate interests in ascertaining the parentage of minor children and enforcing parental support obligations.

Appointment of counsel will not only advance substantial state interests, it should serve the child's interests as well. The child, to a large extent forgotten in such proceedings, has been termed the "principal plaintiff" in a paternity action. (Krause, *supra,* at p. 108.) In a sense, it is the child's identity that is litigated in a proceeding to determine parentage. Any determination that a particular individual is a child's biological father may have profound sociological and psychological ramifications. Further, the child's rights of support and inheritance against the father are at issue, as well as his or her future obligation to support the father. (Civ. Code, § 206.) "If the child is to have anything, it

must have a *right* to have his paternity ascertained in a fair and efficient manner." (Krause, *supra,* at p. 113, italics in original.) It is in the child's interest not only to have it adjudicated that *some* man is his or her father and thus liable for support, but to have some assurance that the correct person has been so identified. When the state initiates paternity proceedings, whether on behalf of the mother (as in *Salas* v. *Cortez*) or the child (as in *David M.* v. *Castellanos*), the state owes it to the child to ensure that an accurate determination of parentage will be made.

## III

■ Accordingly, this court holds that in proceedings to determine paternity in which the state appears as a party or appears on behalf of a mother or child, indigent defendants are constitutionally entitled to appointed counsel.[10] (Accord *Reynolds* v. *Kimmons, supra,* 569 P.2d 799; *Artibee* v. *Cheboygan Circuit Judge, supra,* 243 N.W.2d 248.) The extent to which the right to appointed counsel shall apply in cases other than those which are commenced in the future must "turn upon considerations of fairness and public policy." (*Li* v. *Yellow Cab Co.* (1975) 13 Cal.3d 804, 829 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393].) Lack of counsel seriously impinges upon the integrity of the fact-finding process. Accordingly, this court concludes that appellants are entitled to the benefit of the rule announced today. Similarly, this rule shall apply to all cases not final as of the date of the finality of this opinion. However, where a judgment of paternity has become final, obligations, and, in some cases, familial relationships have been established by that judgment. Therefore, this court holds that in cases where a judgment of paternity has become final, the fact that the defendant did not have counsel may not be advanced as a reason to attack that judgment. (Cf. *In re Jacqueline H.* (1978) 21 Cal.3d 170, 179 [145 Cal.Rptr. 548, 577 P.2d 683].)

The judgments are reversed. These cases are remanded to the trial court with directions to appoint counsel for defendants if they can demonstrate their indigency.

Tobriner, J., Mosk, J., and Newman, J., concurred.

**RICHARDSON, J.**—I respectfully dissent. The majority has, without benefit of any decisional precedent or statutory support, substantially

---

[10] *Ford* v. *Herndon* (1976) 62 Cal.App.3d 492 [133 Cal.Rptr. 111] is disapproved to the extent that it is inconsistent with this opinion.

expanded the definition of due process to require appointment of counsel to represent defendants in paternity proceedings brought by the state. This action is directly contrary to the United States Supreme Court's recent expression on the matter of appointed counsel in *Scott* v. *Illinois* (1979) 440 U.S. 367 [59 L.Ed.2d 383, 99 S.Ct. 1158]. In *Scott,* the defendant, an indigent, was convicted of shoplifting and fined $50 after a bench trial at which he was not represented by counsel. The statute under which he was convicted provided for a maximum penalty of a $500 fine, one year in jail, or both. The high court held that the Sixth and Fourteenth Amendments do not require a state trial court to appoint counsel for a criminal defendant who is charged with a statutory offense for which imprisonment upon conviction is authorized but not imposed.

The court emphasized "that *Argersinger* [v. *Hamlin* (1972) 407 U.S. 25 (32 L.Ed.2d 530, 92 S.Ct. 2006)] did indeed delimit the constitutional right to appointed counsel in state criminal proceedings. Even were the matter *res nova,* we believe that the central premise of *Argersinger—that actual imprisonment is a penalty different in kind from fines or the mere threat of imprisonment—is eminently sound and warrants adoption of actual imprisonment as the line defining the constitutional right to appointment of counsel."* (Italics added, p. 373 [59 L.Ed.2d at p.389].) The reasoning of this opinion is compelling and neither the California Constitution (art. I, § 14) nor any interest peculiar to this state indicates that this court should reach any contrary conclusion.

In the two cases consolidated before us, the County of Ventura paid welfare monies for the support of children born out of wedlock. In order to recover these monies and to avoid indefinitely continuing future support payments for the children, the county instituted these proceedings to establish the paternity of the children and to impose on defendants, if they are determined to be the fathers, the obligation to support their children and to reimburse the county for support payments already made. In light of both the objective and nature of such a proceeding, the right to free counsel is not constitutionally mandated.

There are only two types of proceedings in which either the United States Supreme Court or the California courts and Legislature have required appointment of counsel for indigent defendants on due process grounds. The first class of cases is that which may result in a deprivation

of liberty, and the second is that in which the state seeks to remove a child from the custody of its parent. Both situations are clearly distinguishable in their nature from the present one and I shall discuss each in turn.

Where a legal proceeding may result in an infringement of a defendant's personal liberty, there is clearly a right to counsel, regardless of whether the action is labeled civil or criminal. A paternity proceeding is obviously a civil suit which cannot result in the deprivation of the defendant's liberty. The only possible consequence of such an action is the imposition of a financial obligation. While the majority focuses on the collateral possibility that a defendant might be jailed for his refusal to pay a support order arising from a paternity suit, such a criminal prosecution, at which the indigent defendant *would* be entitled to appointed counsel, is a totally separate proceeding and not an inevitable sequel to the paternity action itself. Persons under the obligation of a child support order who are truly indigent are rarely jailed. Criminal prosecutions which may result in confinement, like contempt proceedings in civil nonsupport cases, are usually reserved for cases of wilful noncompliance with a court order or wilful failure to support, *by those having the ability to do so.* (*Nutter* v. *Superior Court* (1960) 183 Cal.App.2d 72, 75 [6 Cal.Rptr. 404]; Pen. Code, § 270.)

While a judgment in a paternity proceeding is admissible in a nonsupport prosecution, it is not conclusive on the issue of paternity nor does it relieve the prosecution of proving guilt of the nonsupport charge beyond a reasonable doubt. (*Patterson* v. *Municipal Court* (1965) 232 Cal.App.2d 289, 299 [42 Cal.Rptr. 769].) Similarly, although the defendant in a paternity suit, as in any other civil action, might make statements which could be used against him in a subsequent criminal prosecution, the criminal proceeding is tangential to the paternity action and such collateral consequences do not require the appointment of counsel in the paternity proceeding. (*Borror* v. *Department of Investment,* (1971) 15 Cal.App.3d 531 at pp. 539-541 [92 Cal.Rptr. 525]; *In re Groban* (1957) 352 U.S. 330 [1 L.Ed.2d 376, 77 S.Ct. 510].)

In *Ford* v. *Herndon* (1976) 62 Cal.App.3d 492 [133 Cal.Rptr. 111], the Court of Appeal in discussing the precise question before us concluded as follows: ". . . it must be acknowledged that indigency alone does not require the state to provide free counsel in all legal proceedings. [¶] The absolute due process requirement is that no person be imprisoned for an *offense* unless he is represented by counsel at trial. (*Argersinger* v. *Hamlin*

(1972) 407 U.S. 25, 37 . . . ; Cal. Const., art. I, § 15.) Unlike the absolute right to counsel mandated by specific provisions of both federal and state Constitutions for individuals accused of criminal offenses, the right to counsel in other than criminal proceedings is conditioned and determined on a case by case basis. (*In re Love* (1974) 11 Cal.3d 179, 189 . . . .)" (Pp. 498-499; see also *State* v. *Walker* (1976) 87 Wn.2d 443 [553 P.2d 1093]. [The purposes of a paternity action are twofold: (1) The establishment of paternity; and (2) the imposition of a support obligation if the defendant is found to be the father of the child. The deprivation or restriction of defendant's liberty is never a direct result of a filiation proceeding.])

By reason of the very nature of the two proceedings and the differential consequences to a defendant as a result thereof, the due process protections afforded at public expense to criminal defendants, who may lose their liberty, have been held not to apply to ordinary civil litigants whose primary interest in the outcome of a suit is financial. Thus, "[t]he ordinary civil litigant is not entitled to free transcripts on appeal at public expense." (*Leslie* v. *Roe* (1974) 41 Cal.App.3d 104, 107 [116 Cal.Rptr. 386].) An indigent debtor has no constitutional right to the waiver of bankruptcy filing fees. (*United States* v. *Kras* (1973) 409 U.S. 434 [34 L.Ed.2d 626, 93 S.Ct. 631].) Recipients of social welfare benefits are not entitled to the waiver of filing fees for appellate review of a disputed decrease in welfare benefits. (*Ortwein* v. *Schwab* (1973) 410 U.S. 656 [35 L.Ed.2d 572, 93 S.Ct. 1172].) It is abundantly clear that the weight of authority is against extension of the due process rights of criminal defendants and other litigants threatened with the loss of liberty or an important family interest to ordinary civil litigants who, like these defendants, have only a monetary interest in the outcome of the litigation.

As one faced with a possible monetary loss, the defendant in a paternity action is a kinsman to all other defendants in civil suits who may become judgment debtors. The majority supports its position by noting that the defendants here were "opposed by the full resources of the state." (*Ante,* p. 30.) It is an undeniable fact of life that in many civil suits the parties are unequally matched in terms of legal representation even though there may be potentially serious legal consequences and the defendant's reputation may suffer as the result of an adverse judgment. We need not, and cannot, by judicially rearranging financial burdens seek to equalize all such legal conflicts by fastening a new fiscal obligation on the public taxpayer.

In *Ross* v. *Moffitt* (1974) 417 U.S. 600 [41 L.Ed.2d 341, 94 S.Ct. 2437], the Supreme Court, discussing the right of criminal defendants to counsel in seeking discretionary appeals, stated that "[T]he fact that a particular service might be of benefit . . . does not mean that the service is constitutionally required." (P. 616 [41 L.Ed.2d at p. 354].) California has no duty to "duplicate the legal arsenal that may be privately retained" by a defendant. It must only "assure the indigent defendant an adequate opportunity to present his claims fairly . . . ." (*Ibid.* [41 L.Ed.2d at p. 354].)

The majority contends, however, that a distinction must be made when the state is the plaintiff in the suit. I disagree. There are numerous situations, as with a contract dispute or defense of a tort claim, in which a party finds himself arrayed against the state. To follow the majority's reasoning free counsel would have to be provided the civil litigant in all these cases as well, in order to restore some imaginary sense of litigation balance.

The majority relies on two cases for the general proposition that a defendant has the right "to appointed counsel under certain circumstances, regardless of whether the action is labelled criminal or civil." Both cases involve proceedings culminating in deprivation of liberty and are thus readily distinguishable from the present case.

In *Specht* v. *Patterson* (1967) 386 U.S. 605 [18 L.Ed.2d 326, 87 S.Ct. 1209], the defendant was convicted of the crime of indecent liberties under a Colorado statute which provided a maximum sentence of 10 years but was sentenced under the Sex Offenders Act for an indeterminate term of from 1 day to life imprisonment. The requisite procedure, a complete psychiatric examination and a report thereof given to the trial judge before sentencing, was complied with in the defendant's case, but no hearing was held. The Supreme Court held that the invocation of the act, which entailed the making of a new charge leading to *criminal* punishment, requires, under the due process clause, that petitioner should be present with counsel and have available the other rights attendant on any criminal hearing. The court specifically determined that "The punishment under the second Act is *criminal* punishment . . . ." (P. 608 [18 L.Ed.2d at p. 329], italics added.)

Similarly, in *In re Gault* (1967) 387 U.S. 1 [18 L.Ed.2d 527, 87 S.Ct. 1428], the United States Supreme Court saw the similarity to the aims and objectives of criminal law enforcement when it upheld the right to

counsel in a juvenile court proceeding which could result, upon a determination of delinquency, in a commitment to an institution in which the juvenile's freedom is curtailed. No possible limitation of freedom is present in the paternity hearing and thus the principles espoused in *Gault* are manifestly not applicable.

Other cases cited for the general proposition that "due process has been held to include the right of an indigent defendant to appointed counsel in certain civil proceedings" are similarly inapposite. In *Artibee* v. *Cheboygan Circuit Judge* (1976) 397 Mich. 54 [243 N.W.2d 248], the state statute dealing with paternity action provided that a warrant could issue upon the filing of such a suit. The defendant in that case was in fact arrested. Upon arraignment the defendant's failure to make the required recognizance or cash deposit could result in his commitment to county jail. Thus, again, in that case incarceration was possible. Under California statutes such an arrest in a paternity action is not possible.

The majority cites only one case dealing directly with the matter of paternity suits which even arguably supports its position, namely, *Reynolds* v. *Kimmons* (Alaska 1977) 569 P.2d 799, in which the Supreme Court of Alaska, by a two-to-one vote, held that due process requires appointment of counsel for an indigent defendant in a paternity suit in which the mother was represented by the state. Nothing in the facts of that case, however, indicate whether the state had expended welfare monies to support the child or had any obligation to do so. In the *Reynolds* case, therefore, it is unclear whether the state had any pecuniary interest of its own to protect.

By way of contrast, the purely economic interests of California in prosecuting paternity actions is underscored by the fact that in the case of a mother who has received welfare benefits, such parent is not even a necessary party and the action may be brought in the state's own name as an assignee of the parent's rights. (42 U.S.C. § 602(a)(26); Welf. & Inst. Code, §§ 11350.1, 11476.) While I note that there is provision in the California statutory scheme for the involvement of the state in a paternity action even when the state has made no payment of funds, such a case is not before us now and we need not determine at this juncture how the right to counsel issue would be resolved in such a suit when California has no financial stake in the result.

While *access* to the courts is constitutionally protected, this access need not be guaranteed in the form of free counsel. In *Payne* v. *Superior Court*

(1976) 17 Cal.3d 908, 914 [132 Cal.Rptr. 405, 553 P.2d 565], cited by the majority, we held that the unqualified deprivation of a prisoner's access to the courts to protect his property rights constituted a violation of his rights under the due process and equal protection clauses of both the federal and state Constitutions and we left it to the individual courts to determine how such access would be guaranteed. We cautioned ". . . we emphasize the limits of our holding. We have not ruled that all indigents have a right to counsel in civil cases." (P. 926.) In *Boddie* v. *Connecticut* (1971) 401 U.S. 371 [28 L.Ed.2d 113, 91 S.Ct. 780], also cited by the majority the issue again was strictly one of access. The Supreme Court there concluded that due process prohibited a state from denying court access to individuals seeking dissolution of their marriages simply because they were unable to pay court fees. Access to these persons could be provided by allowing waiver of the requisite fees.

Appellants here do not allege that they were denied access to the courts. They were personally served and thus properly notified of the proceedings. There is no indication that their lack of personal funds deprived them of an opportunity to defend themselves. Both were offered and received assistance in learning how to present their cases in propria persona. Both were apparently physically able to come to court although neither chose to do so. Even though appellant Cortez is apparently unable to speak English, the court appointed an interpreter for him and he was evidently able to communicate sufficiently with the legal aid society in Spanish for them to prepare a declaration in English for him to sign.

The record does not disclose whether appellants attempted to find counsel on a pro bono basis. It is regrettable that the legal aid society was unable to represent them, and if, as contended by the legal aid society, proceedings of these types involve "basic, fundamental rights" the society may wish to reconsider its priorities in determining which cases to accept.

Our courts and Legislature have also provided for appointment of counsel in proceedings in which the state seeks to deprive a parent of the custody of a child. In *In re Jacqueline H.* (1978) 21 Cal.3d 170 [145 Cal.Rptr. 548, 577 P.2d 683], we held that an indigent person is entitled to appointed counsel when appealing from a judgment following a hearing for permanent termination of her parental rights and to remove her child from her custody. From this fact the majority argues that because a paternity proceeding also involves the parent-child relationship the

defendant, like the mother in *Jacqueline H.,* must be provided counsel. I am unpersuaded:

First, the majority fails to acknowledge that the Legislature has specifically provided statutorily for the appointment of counsel at the hearing aimed at removing custody from a parent. (Civ. Code, § 237.5; Welf. & Inst. Code, § 634.) It follows that appointment of counsel on appeal from a judgment after such a hearing is merely a logical concomitant of that legislatively created right. No such legislation affects the matter before us.

Second, the essential difference is patent between proceedings to *terminate* natural parental relationships and actions to *establish* paternity. Cases such as *Jacqueline H.* concern an existing familial relationship which the adult wishes to continue. All paternity proceedings, by definition, involve the *denial* of the parental relationship and the opposition to the establishment of such a relationship. "Basic, fundamental rights" are clearly involved in the former; only economic interests are involved in the latter. Surely only the most cynical logician could conclude that the same due process rights attendant on the claim of custody attach as well to the denial of paternity, and that the state's obligation is no greater in the former than in the latter. It is fair to ask—what *familial* interest is being served by furnishing free counsel to a defendant who is fighting *against* the establishment of a paternal relationship? The majority has inverted the affected interests.

It seems self-evident that the central issue in paternity suits is neither the establishment or maintenance of the family unit nor the parent's bond with the child. What is at stake is money. The state wishes to place the financial responsibility for support of the child on a legally responsible adult. It is only this financial obligation that can be imposed. The state cannot, despite the majority's allusion to "moral" obligations, order a man to act as a father; it can only designate him as such. I am unable to accept the majority's belief that if an indigent is provided with counsel and adjudged to be the father of a child after a fair hearing based on scientific evidence, he is more likely to fulfill his support obligations. (*Ante,* p. 33.) Such undocumented speculation is readily dispelled by the statistics in its own footnote 9 (*ante,* p. 32) which very strongly indicates that divorced fathers, who presumably are *not* contesting the paternity of their children, are less than cooperative in their compliance with support orders. In the context of a resisting father the usual paramount motivation is the *financial* implication not the imposition of an unwanted

personal relationship which the court lacks power to monitor in any event.

Nevertheless, whatever one's belief concerning the consequences of these judgments to these appellants, the solution does not lie in creating by judicial fiat a constitutional right to appointed counsel in paternity proceedings. It is my view that the financial implications of such a decision may very well be tremendous and beyond our capacity to determine. If the civil litigant is now to be furnished free counsel, what of the expenses of extensive discovery, and can the cost of the retention of an expert witness be far behind? The majority is strangely silent on the critical question—who is going to pay for counsel? Is it to be, as in *Payne,* a pro bono responsibility of the bar? Is it the Legislature which must appropriate for it from public funds? Once again, it is the Legislature which should determine by what means and to what extent the public should provide free legal services in civil matters. Thus far the Legislature has made no provision for such appointments in the Uniform Parentage Act (Civ. Code, § 7000 et seq.). Indeed, when originally introduced as Senate Bill No. 347 in the 1975-1976 Legislature, the act contained a proposed section 7019 which would have expressly required that the court appoint counsel for a party financially unable to employ counsel. This provision was expressly deleted, and that fact should tell us something.

What the majority expresses today is not constitutional interpretation; rather, it is the majority's personal subjective judgment of "fundamental fairness." It bears repeated expression that due process requirements neither necessitate nor allow such an expansion of the obligation of the state on such nonconstitutional standards as personal views of fairness. It is the people themselves and the Legislature which represents them and not the courts which are constitutionally vested with the power to amend and expand the Constitution. Tempted frequently as they may be, courts should not usurp that power in order to rearrange in accordance with their own views, the financial relationship in a civil case between the public entity and an indigent defendant.

I would affirm the judgments.

Clark, J., and Manuel, J., concurred.

Respondents' petition for a rehearing was denied May 16, 1979. Clark, J., Richardson, J., and Manuel, J., were of the opinion that the petition should be granted.