No. 81-90

IN THE SUPREME COURT OF THE STATE OF MONTANA

1981

RONALD E. ROSE,

Petitioner and Appellant,

vs.

THE DISTRICT COURT OF THE EIGHTH
JUDICIAL DISTRICT OF THE STATE OF
MONTANA, Cascade County, H. William Coder, Judge,

Respondents.

ORIGINAL PROCEEDING:

Counsel of Record:

For Appellant:

Lawrence A. Anderson argued, Great Falls, Montana

For Respondents:

Hon. Mike Greely, Attorney General, Helena, Montana
Mark Murphy, argued, Assistant Attorney General, Helena,
 Montana
J. Fred Bourdeau, County Attorney, Great Falls, Montana
Barbara Bell argued, Deputy County Attorney, Great Falls,
 Montana
Mike Garrity argued, Dept. of Revenue, Helena, Montana
Robert F. James, Great Falls, Montana

Submitted: April 24,1981

Decided: MAY 2 8 1981

Filed: MAY 2 8 1981

Thomas J. Kearney
——————————————————————————
                                    Clerk

Mr. Justice Gene B. Daly delivered the Opinion of the Court.

This is an application for a writ of certiorari seeking a review of the proceedings by which Ronald Rose was adjudged guilty of contempt of court.

The record discloses that on or about January 15, 1980, the State of Montana, the Department of Revenue, the Department of Social and Rehabilitation Services, Diana L. Ruff and Lisa M. Ruff filed a petition in the District Court of the Eighth Judicial District, Cascade County, to establish paternity and provide support for a minor child born on September 21, 1979. The petition alleged that the State, the mother and the daughter ". . . are informed and believe that Respondent [Rose] is the father of the child based upon the following: Diana L. Ruff has named the Respondent, Ronald E. Rose, as the father of the minor child, Lisa M. Ruff." Attendant to the petition was a motion to require Rose to submit to blood tests pursuant to section 40-6-112, MCA. An ex parte order was issued by the District Court requiring Rose to show cause why he should not submit to a blood test. On February 28, 1980, Rose filed an answer.

On March 11, 1980, Rose filed a motion to quash the order to show cause. The basis for Rose's motion was that submission to a blood test would violate various constitutional rights including his right of privacy and freedom from unreasonable searches and seizures. In opposition the petitioners argued that the reasonableness of the intrusion, coupled with the compelling state interest to determine parentage, authorizes the minimal invasion of privacy involved in obtaining a blood sample.

On August 21, 1980, the District Court entered its order vacating the pretrial hearing originally set for August 20, 1980, and reset it for December 15, 1980. The District Court additionally ordered that the State's motion compelling discovery be heard on September 19, 1980. Subsequently, on October 9, 1980, the District Court issued an ex parte order for blood tests, whereby Rose was ordered to appear at Columbus Hospital, Great Falls, Montana, on October 21, 1980, to submit to a blood test. After formally asserting his right to refuse the test, Rose failed to appear for the court-ordered blood test.

On November 5, 1980, the District Court ordered Rose to show cause why he should not be held in contempt of court for failing to take the blood test. On November 28, 1980, the District Court found Rose in contempt of court and issued the following decree:

> "1. That Respondent, Rose, be confined in the Cascade County Jail for a period of five days;
>
> "2. That the execution of said judgment of contempt and order of confinement in the Cascade County Jail be, and hereby is, stayed;
>
> "3. That Respondent, Rose, may purge himself of said contempt by complying with the Court's Order of October 9, 1980, by submitting to the required blood test within fourteen days from the date hereof;
>
> "4. That the Clerk of this Court is directed to provide notice of this Order by mailing a true copy thereof to the Respondent, Rose."

On December 11, 1980, Rose filed a complaint in the United States District Court alleging civil rights violations under 42 U.S.C. 1983, in that section 40-6-112, MCA, violated his constitutional rights. Rose prayed that the court grant injunctive relief barring the State

-3-

District Court from ordering blood tests under section 40-6-112, MCA. On January 6, 1981, the State filed a motion to dismiss with supporting briefs. The Federal District Court has not issued a temporary restraining order or granted any injunctive relief at this time, and the motion to dismiss is presently under advisement.

On or about March 3, 1981, Rose filed with this Court an application for writ of certiorari or other appropriate relief to determine the matters set forth above.

On June 27, 1980, prior to being held in contempt by the District Court, petitioner filed a petition for a writ of supervisory control with this Court. The petition was denied on the ground that he had an adequate remedy by appeal. This ruling contemplated that petitioner would submit to the blood test and, in the assertion of constitutional rights, either move to suppress the results prior to an adjudication of paternity or appeal the final judgment on the merits. This procedure would answer petitioner's contention that submission to a blood test is an irretrievable forfeiture of constitutional rights; however, it does not prevent a possible constitutional violation in the first instance.

Herzog v. Reinhardt (1965), 2 Ariz.App. 103, 406 P.2d 738, holds that citizens are protected from arbitrary actions of the trial court. If fundamental constitutional rights are violated in the contempt process, the contempt order can be attacked collaterally as void, upon certiorari. Also, in precluding an appeal from an adjudication of contempt, section 3-1-523, MCA, provides that the only method of review is a writ of certiorari. A writ of

certiorari will issue only when a trial court has exceeded its jurisdiction. State v. District Court of Second Judicial District (1900), 24 Mont. 494, 62 P. 820; Matter of Graveley (1980), _____ Mont. _____, 614 P.2d 1033, 37 St.Rep. 1261.

The statute in question is section 40-6-112, MCA, which is attacked in isolation from the balance of the Uniform ~~Paternity~~ Parentage Act and provides as follows:

"(1) The court may, and <u>upon request of a party shall</u>, require the child, mother or alleged father to submit to blood tests. The tests shall be performed by an expert qualified as an examiner of blood types, appointed by the court.

"(2) The court, upon reasonable request by a party, shall order that independent tests be performed by other experts qualified as examiners of blood types.

"(3) In all cases the court shall determine the number and qualifications of the experts." (Emphasis added.)

In Marshall v. Barlows, Inc., OSHA (1978), 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305, the United States Supreme Court held the search and seizure provision of the Fourth Amendment applicable to civil as well as criminal investigations. The Court also held in Schmerber v. California (1966), 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908:

"Court-ordered blood tests are undoubtedly 'searches' within the meaning of the constitution. The Fourth Amendment proscription, however, is directed <u>only to those searches which are unreasonable.</u> An unreasonable search is one unjustified by the circumstances <u>or carried out in an improper manner</u>." 384 U.S. at 757. (Emphasis supplied.)

In State v. Meacham (1980), 93 Wash.2d 738, 612 P.2d 795, precisely the same points came before the Washington

court as are presented in the case before us today. In that case, which involved two separate cases consolidated for appeal, the putative fathers were ordered to submit to the withdrawal of a small amount of their blood for testing. Each objected on constitutional grounds: (1) invasion of the right of privacy; (2) the unlawful search and seizure; and (3) interference with their freedom of religion.

With respect to privacy the Washington court said:

"The right to privacy, to be let alone, while fundamental and personal in nature, is not absolute. The State may reasonably regulate this right to safeguard society or where it otherwise has a compelling interest. Whalen v. Roe, 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977).

"Here, the State has a compelling interest in fixing the parentage of a minor child. The test specified to be used is highly reliable. No other evidence that is at all comparable in effectiveness is available to the State. The pain inflicted when blood is withdrawn by an experienced technician is inconsequential. And, any hazard to health is virtually nonexistent." 612 P.2d 797.

With respect to the argument that the blood test was an unreasonable search and seizure, the Washington court said:

"In addition to the issue of privacy, appellants challenge the order to submit to blood withdrawal on grounds that it constitutes an illegal search and seizure under the Fourth Amendment. We reject that contention out of hand.

"'Court-ordered blood tests are undoubtedly "searches" within the meaning of the constitution. The Fourth Amendment proscription, however, is directed only to those searches which are unreasonable. An unreasonable search is one unjustified by the circumstances or carried out in an improper manner.' Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 60 L.Ed.2d 908 (1966).

"For example, in Schmerber, a blood sample was taken over the objections of a criminal defendant. An informed, deliberate decision

-6-

was made to order the test. Because of the State's interest in deterring driving while under the influence of alcohol and the relatively inoffensive nature of a properly conducted blood test, the taking of the defendant's blood in the hospital setting was not deemed to be an unreasonable search." Meacham, 612 P.2d at 798.

However, the blood tests in Meacham were ordered after a full adversary hearing before the trial court where it was determined that a prima facie showing had been made to justify the order for blood tests. Here, attempts at discovery from petitioner have been met with constitutional objections as to his testimony. A deposition of the mother was taken before the second order which indicated sexual activity with petitioner.

The Montana statute on blood tests in paternity proceedings is found in a section of the Uniform Parentage Act, Title 40, Montana Code Annotated. The Act has been adopted now in most of the states. The Act arises because of the efforts of the federal government to recover monies paid for the support of dependent children where the children are born out of wedlock or, as here, an absent parent is not supporting his child.

There is a strong societal reason for upholding such acts which rise from decisions of the United States Supreme Court in the 1970s that illegitimate children were entitled to the same constitutional benefits and protections as legitimate children. Out of this concept, only lately developed, has come the doctrine that a mother, even though not wed, or living apart from the father, nevertheless has a right to have the burden of support shared by the father of the child. The California court in Salas v. Cortez, (1979), 154 Cal.Rptr. 529, 593 P.2d 226, defines the State interest

in these cases as follows:

> "The state's interest in determining
> parentage has traditionally been limited to
> preventing children born out of wedlock from
> becoming public charges (see an Act for
> Setting the Poor on Work (1576), 18 Eliz. 1,
> Ch. 3, § 2, quoted in Krause, supra, at pp.
> 105-106). The amendments to federal law
> which gave rise to the present cases were
> brought about by concerns similar to those
> that inspired the Elizabethan Poor Laws--the
> increasing appearance on the welfare rolls of
> children born out of wedlock. (See, Note
> (1976), 52 Wash.L.Rev. 169, 170.) In recent
> years nearly half of the families receiving
> AFDC have had at least one child born out of
> wedlock. (Id. at 177.) Were the state able
> to recover from absent parents even a portion
> of the funds expended through the AFDC
> program, the savings would be substantial.
> (See, Id. at 172.)

> "It is clearly within the power of the state
> to provide for the enforcement of the
> parental duty to support one's children. The
> state may further legitimately provide for
> the expenditure of public funds to assist
> custodial parents in enforcing the support
> obligations of absent parents, whether or not
> the custodial parent is receiving public
> assistance. Such efforts are a laudable
> attempt to prevent custodial parents, the
> overwhelming majority of which are women,
> from having to bear alone the burden of a
> mutual decision to engage in sexual relations
> . . ." 593 P.2d at 233.

In Salas, the court held that an indigent putative
father was entitled to counsel, supplied at the expense of
the state.

Although a number of cases are now arising on the
problem of blood tests under the Uniform Parentage Act, no
court has set aside the statute requiring blood tests as
unconstitutional per se. The legal significance of blood
tests is not that the results may possibly include the
accused as the father, but that such results may positively
exclude him as the father. Thus, it has been held in any
number of cases that a father has an absolute right to

demand a blood test of the mother and child, even to get a continuance if the child has not yet been born for the reason that such test may positively exclude him as the father. See People v. Stoeckl (Mich. 1956), 78 N.W.2d 640. Thus, the rights of the parties are reciprocal, and a constitutional elimination of the statute would severely limit the rights of the putative father.

To understand the procedure in the Uniform Parentage Act, particularly with relation to blood tests, it is necessary to realize the advances that have been made in connection with blood tests. For this purpose, a reading of Current Status of Paternity Testing, by Dr. Chang Ling Lee, 9 Family Law Quarterly 615 (1975), is instructive. The article explains the various means of testing for genetic markers.

Under section 40-6-114(4), MCA, it is provided that if the scientific evidence resulting from a blood test conclusively shows the defendant could not have been the father, the action shall be dismissed. If, however, there is a statistical chance that he is the father, the blood tests, weighed in accordance with the evidence, are admissible relative to the paternity. Section 40-6-113(3), MCA.

In the present case it is apparent that the statutory procedure has not been followed. What should occur under the Uniform Parentage Act is that after the action has been brought to declare the paternity of the child, an informal hearing by way of pretrial proceedings should occur. Section 40-6-111, MCA. At the pretrial hearing, if any party to the action refuses to testify under oath, the court

-9-

may order him to testify. If he refuses to testify, the court has the power to grant him immunity from all criminal liability on account of the testimony he is required to produce (except for perjury). Section 40-6-111(2), MCA.

It is at the pretrial proceeding that the court may order the blood tests. Section 40-6-112, MCA. At that point, therefore, it is assured from the statutory scheme that a prima facie case (the equivalent of probable cause in a criminal proceeding) is established for the ordering of the blood test. It is at the pretrial proceedings that the evidence relating to paternity, including the blood tests, are considered. Section 40-6-114, MCA. Thereafter, there are pretrial recommendations to be made as set forth in section 40-6-114(1), MCA. At that point, the court considers whether or not the case should go on. The statute says:

> "On the basis of the information produced at the pretrial hearing, the judge or referee conducting the hearing shall evaluate the probability of determining the existence or nonexistence of the father and child relationship in a trial and whether a judicial declaration of the relationship would be in the best interest of the child. On the basis of the evaluation, an appropriate recommendation for settlement shall be made to the parties, which may include any of the following: [options omitted]." Section 40-6-114, MCA.

As our discussion has revealed, the mere conclusory allegations by the movant in the petition are insufficient to satisfy the "reasonableness" requirement of the Fourth Amendment of the United States Constitution and Art. II, Section 11, 1972 Montana Constitution. Reasonableness can only be established by an affirmative showing by the movant that there exists a prima facie case against the putative

father. After this, a blood test may be taken. Therefore, the Uniform Parentage Act, as it relates to this subject, must be construed as a whole, and we will not consider an attack upon an isolated section, i.e., section 40-6-112, MCA, to determine its constitutionality.

However, we do conclude that the failure to follow the statutory procedures to establish reasonableness prior to the ordering of the "search" renders the ordered search a violation of the accused's Fourth Amendment rights to be secure from "unreasonable" search and also violates Art. II, Section 11, 1972 Montana Constitution.

The writ, as prayed for, shall issue:

1. The contempt order of November 28, 1980, by the District Court is hereby vacated and set aside.

2. The case is returned to the District Court with instructions to follow the procedure set forth in the Uniform Parentage Act as discussed herein. As provided in section 40-6-111, MCA, this will require an informal pretrial proceeding before the court. In the event a prima facie case is made showing the defendant to be a possible father, then an order properly may be made requiring the defendant to submit to the blood test. In the event defendant refuses to testify, the court may grant him immunity from all criminal liability and thereafter require that he take the blood test.

3. A copy of this opinion, when served by the Clerk of this Court, shall perform the office of a formal writ.

_____
Justice

-11-

We concur:

_____
Chief Justice

_____

_____

_____

_____
Justices

_____
Honorable James B. Wheelis,
District Judge, sitting in
place of Mr. Justice John C.
Harrison

-12-