[Civ. No. 21377. Fourth Dist., Div. Two. Dec. 5, 1980.]

FRANK GONZALES et al., Petitioners, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
DEBBIE G. et al., Real Parties in Interest.

COUNSEL

Robert Klotz for Petitioners.

Barbara A. Smith and Harold F. Tyvoll as Amici Curiae on behalf of Petitioners.

Cecil Hicks, District Attorney, Michael R. Capizzi, Assistant District Attorney, John D. Conley, William W. Bedsworth and James Branch, Deputy District Attorneys, for Respondent and for Real Parties in Interest.

George Deukmejian, Attorney General, Daniel J. Kremer, Assistant Attorney General, Harley D. Mayfield and M. Howard Wayne, Deputy Attorneys General, as Amici Curiae on behalf of Respondent and Real Parties in Interest.

OPINION

McDANIEL, J.—In the three underlying civil actions out of which the original proceeding now before us arose, the District Attorney of Orange County, on behalf of certain minor children (and one unborn child) and their mothers, sought to establish the paternity of the children and to obtain court orders for support payments by their

fathers. The filing of these actions by the district attorney was mandated by section 11350 of the Welfare and Institutions Code[1] because Orange County has paid categorical aid (AFDC) to the mothers of these children under the Burton-Miller Act, chapter 2, part 3, division 9 of the Welfare and Institutions Code. (Welf. & Inst. Code, § 11200 et seq.)

After each of the three actions had been filed and each of the alleged fathers had answered, denying paternity, the district attorney caused to be served upon each an identical set of interrogatories containing fifty-six questions. These questions fall generally into two subject-matter areas relevant to the objectives of the litigation. One area (Nos. 6-17) inquired into the financial condition of the alleged father; the other area (Nos. 18-53) into the sexual relationship and other personal contacts between the mother and the alleged father.

Each alleged father refused to answer Nos. 6-24 and Nos. 27-55 "on the [stated] grounds that the matters inquired into were privileged, under the privilege against self-incrimination."[2] Thereupon, the district

---

[1] In pertinent part section 11350 of the Welfare and Institutions Code reads: "In any case of separation or desertion of a parent or parents from a child or children which results in aid under this chapter being granted to such family, the noncustodial parent or parents shall be obligated to the county for an amount equal to:

"(a) The amount specified in an order for the support and maintenance of such family issued by a court of competent jurisdiction; or in the absence of such court order,

"(b) The amount of aid paid to the family during such period of separation or desertion limited by such parent's reasonable ability to pay during that period in which aid was granted; and

"(c) Such obligation shall be reduced by any amount actually paid by such parent during such period of separation or desertion for the support and maintenance of such family.

"The district attorney shall take appropriate action pursuant to this section in the superior court of the county which provided aid under this chapter...."

[2] Petitioners claim that answers to the interrogatories could be used against them by the district attorney in subsequent criminal actions for nonsupport under Penal Code section 270.

Penal Code section 270 provides, in part: "If a parent of a minor child willfully omits, without lawful excuse, to furnish necessary clothing, food, shelter or medical attendance, or other remedial care for his or her child, he or she is guilty of a misdemeanor punishable by a fine not exceeding one thousand dollars ($1,000), or by imprisonment in the county jail not exceeding one year, or by both such fine and imprisonment. If a court of competent jurisdiction has made a final adjudication in either a civil or a criminal action that a person is the parent of a minor child and the person has notice of such adjudication and he or she then willfully omits, without lawful excuse, to furnish necessary clothing, food, shelter, medical attendance or other remedial care for his or her child, this conduct is punishable by imprisonment in the county

attorney, in each of the three cases, brought identical motions under section 2034, subdivision (a) of the Code of Civil Procedure, to compel the alleged fathers to answer the questions each had declined to answer. All three motions were granted, and the three alleged fathers (petitioners) have joined in a single petition to this court seeking a writ of mandate and/or prohibition "compelling the Respondent Court to enter an order denying Real Parties' in Interest motions to compel answers to interrogatories . . . ." We issued the alternative writ, and the propriety of the trial court's orders in the three matters is now before us for decision.

### ISSUES AND DISCUSSION

The order to show cause recited in the alternative writ presents two issues: (1) Whether the information sought by the district attorney's interrogatories might tend to incriminate petitioners in terms of possible criminal prosecutions brought later for nonsupport under Penal Code section 270 and hence be protected by privilege; and (2) Whether, for policy reasons, if the privilege is held to be available, the information sought by these interrogatories should nevertheless be divulged under circumstances which would insulate petitioners from later punishment for convictions based on evidence derived from such information.

### I

We turn first to the self-incrimination issue.

### A.

■ The hallowed privilege against self-incrimination as observed in this country derives from the Fifth Amendment to the United States

---

jail not exceeding one year or in a state prison not exceeding one year and one day, or by a fine not exceeding one thousand dollars ($1,000), or by both such fine and imprisonment. . . .

"Proof of abandonment or desertion of a child by such parent, or the omission by such parent to furnish necessary food, clothing, shelter or medical attendance or other remedial care for his or her child is prima facie evidence that such abandonment or desertion or omission to furnish necessary food, clothing, shelter or medical attendance or other remedial care is willful and without lawful excuse. . . .

"The court, in determining the ability of the parent to support his or her child, shall consider all income, including social insurance benefits and gifts.

"The provisions of this section are applicable whether the parents of such child are or were ever married or divorced, and regardless of any decree made in any divorce action relative to alimony or to the support of the child. A child conceived but not yet born is to be deemed an existing person insofar as this section is concerned."

Constitution. While the Fifth Amendment operates only to accord the privilege in federal proceedings, it has been held, perforce of the Fourteenth Amendment, that the privilege must be observed in state court proceedings as well. (*Malloy* v. *Hogan* (1964) 378 U.S. 1, 3 [12 L.Ed.2d 653, 656, 84 S.Ct. 1489].) In other words, the privilege against self-incrimination is now an element of due process protected by the Fourteenth Amendment, and federal standards govern state court proceedings. (*Prudhomme* v. *Superior Court* (1970) 2 Cal.3d 320, 323 [85 Cal.Rptr. 129, 466 P.2d 673].)

In any event, section 940 of the Evidence Code provides, "[t]o the extent that such privilege exists under the Constitution of the United States or the State of California, a person has a privilege to refuse to disclose any matter that may tend to incriminate him." As a result, the interpretations placed upon the language of the Fifth Amendment by the United States Supreme Court are necessarily persuasive in cases in the California courts where the privilege against self-incrimination is invoked. (*Cohen* v. *Superior Court* (1959) 173 Cal.App.2d 61, 67 [343 P.2d 286].)

Turning then to the Fifth Amendment, it provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." Notwithstanding the clear and unambiguous language of this constitutional provision which *limits* the privilege to situations where a criminal proceeding is pending against the person in whom the privilege is vested, the cases have long since expanded the privilege into situations which the drafters of the Bill of Rights surely never dreamed of. Not only does the privilege exist for the benefit of the criminal defendant, as plainly limited by the clear language of the constitutional provision, but by judicial decision it has been broadly extended to a point where now it is available even to a person appearing only as a *witness* in *any* kind of proceeding where testimony can be compelled. In *Kastigar* v. *United States* (1972) 406 U.S. 441 [32 L.Ed.2d 212, 92 S.Ct. 1653], the United States Supreme Court proclaimed that the privilege against self-incrimination "can be asserted in any proceeding, civil or criminal, administrative or judicial, investigatory or adjudicatory . . . ." (*Id.* at p. 444 [32 L.Ed.2d at p. 217].) ■ Thus, however much we may deplore the judicial activism here rampant, petitioners correctly point out that in California the privilege can be claimed by both parties and witnesses in all manner of civil cases. (See, e.g., *Daly* v. *Superior Court* (1977) 19 Cal.3d 132 [137 Cal.Rptr. 14, 560 P.2d 1193] (depositions in a wrongful death action); *Zonver* v. *Superior*

*Court* (1969) 270 Cal.App.2d 613 [76 Cal.Rptr. 10] (interrogatories in a divorce action); and *In re Leavitt* (1959) 174 Cal.App.2d 535 [345 P.2d 75] (judgment debtor examination).)

Section 940 of the Evidence Code, already noted, is applied in practice by resort to criteria set out in section 404 of that code. The latter states: "Whenever the proffered evidence is claimed to be privileged under Section 940, the person claiming the privilege has the burden of showing that the proffered evidence might tend to incriminate him; [however] the proffered evidence is inadmissible unless it clearly appears to the court that the proffered evidence cannot possibly have a tendency to incriminate the person claiming the privilege." Thus, the witness claiming the privilege need not actually prove in the adjudicatory sense the existence of an incriminatory hazard, because to do so would operate to surrender the very protection which the privilege was designed to guarantee. As stated in *Malloy v. Hogan, supra*, 378 U.S. 1, "'in determining whether the witness really apprehends danger in answering a question, the judge cannot permit himself to be skeptical[.]'" (*Id.* at p. 13, fn. 9 [12 L.Ed.2d at p. 663].)

With this array of authority as a bulwark behind them, petitioners proclaim, "[t]hus, the privilege against self-incrimination applies to the discovery proceedings in the civil paternity suits against petitioners herein. The only relevant inquiry is whether the evidence sought from petitioners in the interrogatories [might] tend to incriminate them." We agree.

### B.

■ Accepting then that the procedural occasion for claiming the privilege is proper, what is it that must be involved in the nature of the subject matter of the inquiry to make the claim of privilege available, i.e., what might tend to incriminate?

The privilege here claimed by petitioners as described in the cases not only extends to answers that would in themselves support a criminal prosecution, but it likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the person invoking the privilege. (*Prudhomme v. Superior Court, supra*, 2 Cal.3d 320, 326.) In *Prudhomme*, the court said, "[a]n ordinary witness need not actually prove the existence of an incriminatory hazard as that would surrender the very protection which the privilege against self-incrimination was

designed to guarantee. Instead, the privilege forbids compelled disclosures which could serve as a 'link in a chain' of evidence tending to establish guilt of a criminal offense; in ruling upon a claim of privilege, the trial court must find that it clearly appears from a consideration of all the circumstances in the case that an answer to the challenged question cannot possibly have a tendency to incriminate the witness. [Citations.]" (*Id.* at p. 326.)

As stated in footnote 2, the supposed incrimination over which petitioners are concerned points to a possible prosecution under section 270 of the Penal Code. More particularly, they argue that answers to the interrogatories they have refused to answer could lead to information or evidence which could be used against them in such a prosecution.

As a consequence, if petitioners, in reply to certain of the questions, were to give answers leading to evidence upon which their paternity could be established (e.g., No. 18 asks, "Have you ever had sexual intercourse with ... the mother of the minor plaintiff?"), that evidence would be probative to establish one of the elements to be proved in a section 270 prosecution, namely parenthood.

Similarly, if petitioners' answers disclosed their financial ability to provide clothing, food, shelter, and medical attendance (e.g., No. 7 asks, "What were your gross earnings by month for the past twelve months?"), that answer would be probative to establish another of the elements to be proved in such a prosecution, namely a *lack* of lawful excuse, usually described in the cases as having the *financial ability* to provide the support enjoined by the statute.

In sum, if petitioners were required to answer the interrogatories, as they have now been ordered to do by the trial court, there is no question but that the answers could lead to information or evidence which could be used in a section 270 prosecution, and could therefore "serve as a 'link in a chain' of evidence tending to establish guilt of a criminal offense." (*Prudhomme* v. *Superior Court, supra*, 2 Cal.3d 320, 326.) Based upon the foregoing, there is little doubt in our view that petitioners' answers to the district attorney's interrogatories would be both relevant and damaging should the district attorney ultimately decide to bring criminal nonsupport charges against petitioners under Penal Code section 270. It therefore follows that petitioners' fears of self-incrimination are entirely reasonable and must be respected. (*Hoffman* v. *United States* (1951) 341 U.S. 479, 486 [95 L.Ed. 1118, 1123 - 1124, 71 S.Ct.

814]; *Blau* v. *United States* (1950) 340 U.S. 159, 161 [95 L.Ed. 170, 172, 71 S.Ct. 223].)

## C.

Citing current departmental policy favoring civil remedies over criminal penalties, the district attorney downplays the possibility that the information garnered in the answers to the interrogatories would influence his election to prosecute the petitioners. The department makes clear, however, that the present policy favoring civil recovery is not a hard and fast rule; the district attorney has reserved the option to prosecute petitioners criminally at any time.

As *Salas* v. *Cortez* (1979) 24 Cal.3d 22 [154 Cal.Rptr. 529, 593 P.2d 226], observes the membrane separating civil issues from criminal charges in paternity/support cases is especially thin.[3] Where, as here, the declared policy of the district attorney is imminently changeable, the potential for improper use of answers to the civil interrogatories in possible criminal proceedings against petitioners is too great to overlook.

## D.

The district attorney argues that the Fifth Amendment has no application where criminal conduct may not yet have occurred. By this he means that the criminal intent necessary for conviction remains inchoate until there has been a determination of paternity, which as of now, is denied.

This brings us to a discussion of the United States Supreme Court decision in *Marchetti* v. *United States* (1968) 390 U.S. 39 [19 L.Ed.2d 889, 88 S.Ct. 697]. In that case, the defendant was convicted in the United States District Court for willfully failing to register and pay an occupational tax imposed on those engaging in the business of accepting wagers. After conviction, he pursued an appeal which included a contention that the statutory obligation to register and to pay the tax violated his constitutional privilege against self-incrimination. Although

---

[3]*Salas* held that in paternity cases where the state is an adverse party, alleged fathers are entitled to the right of appointed counsel whether the proceeding is civil or criminal. The adjudication of paternity in a civil case, the court said, could have a significant bearing on any criminal proceedings which might follow. (*Salas* v. *Cortez, supra*, 24 Cal.3d 22, 28-29.)

the circuit court of appeals affirmed, the high court reversed, holding that the registration and tax provisions of the statute could be relied upon to punish a person who defended his failure to comply therewith based upon an assertion of his privilege. In doing so, as pertinent here, it said in passing that "we see no reason to suppose that the force of the constitutional prohibition is diminished merely because confession of a guilty purpose *precedes* the act which it is subsequently employed to evidence." (*Id.* at p. 54 [19 L.Ed.2d at p. 901], italics added.)

In reaching its decision, *Marchetti* was required to deal with two earlier decisions, *United States* v. *Kahriger* (1953) 345 U.S. 22 [97 L.Ed. 754, 73 S.Ct. 510], and *Lewis* v. *United States* (1955) 348 U.S. 419 [99 L.Ed. 475, 75 S.Ct. 415]. Both *Kahriger* and *Lewis* had dismissed contentions that the wagering tax statutes violated the gambler's privilege against self-incrimination. In overruling those cases, the *Marchetti* court said, "There is a second, and more fundamental, deficiency in the reasoning of *Kahriger* and *Lewis.* Its linchpin is plainly the premise that the privilege is entirely inapplicable to prospective acts; for this the Court in *Kahriger* could vouch as authority only a generalization at 8 Wigmore, Evidence § 2259c (3d ed 1940). [Fn. omitted.] We see no warrant for so rigorous a constraint upon the constitutional privilege. History, to be sure, offers no ready illustrations of the privilege's application to prospective acts, but the occasions on which such claims might appropriately have been made must necessarily have been very infrequent." (*Marchetti* v. *United States, supra*, 390 U.S. 39, 53 [19 L.Ed.2d 889, 900-901].)

Having discredited the rationale in *Kahriger* and *Lewis*, the *Marchetti* opinion continues, "The central standard for the privilege's applications has been whether the claimant is confronted by substantial and 'real,' and not merely trifling or imaginary, hazards of incrimination. [Citing *Rogers* v. *United States*, 340 U.S. 367, 374, and others.] This principle does not permit the rigid chronological distinction adopted in *Kahriger* and *Lewis*." (*Id.* at p. 53 [19 L.Ed.2d at p. 901].)

Then follows the quotation first recited above. The analysis then ends with the statement that, "We conclude that it is not mere time to which the law must look, but the substantiality of the risks of incrimination." (*Id.* at p. 54 [19 L.Ed.2d at p. 901].) Applying this test, the court decided that registration information required by the statute here involved would "significantly enhance the likelihood of . . . prosecution for future acts" (*id.* at p. 54 [19 L.Ed.2d at p. 901]) and ruled that the

judgment against Marchetti should be reversed. *Kahriger* and *Lewis* were overruled in the process.

Nevertheless, by way of indicating that it was adopting a quantum type rule of degree, the court also observed that "Insubstantial claims to the privilege as to entirely prospective acts may certainly be asserted, but such claims are not here, and they need only be considered when a litigant has the temerity to pursue them." (*Marchetti* v. *United States, supra*, 390 U.S. 39, 54 [19 L.Ed.2d 889, 901].)

The latter observation was a harbinger of *United States* v. *Freed* (1971) 401 U.S. 601 [28 L.Ed.2d 356, 91 S.Ct. 1112]. *Freed*, a United States Supreme Court decision of much more recent vintage, reversed the dismissal of an indictment of the defendant based upon his alleged violation of the National Firearm Act. That statute makes it unlawful to possess a firearm which has not been registered to him by the transferor thereof. The act also requires that registration be made only by the transferor and that the application for the transfer and registration of the firearm to the transferee be supported by the transferee's photograph and fingerprints. The United States District Court in Los Angeles granted the defendant's motion to dismiss on the ground that enforcement of the statute resulted in punishing him for asserting his privilege against self-incrimination.

The crux of the defendant's argument in *Freed* was that having to furnish the photograph and the fingerprints which he as transferee had not done would serve to incriminate him in the future. As noted, the United States Supreme Court reversed the order of dismissal, and in commenting upon such an argument, the court said that the "argument assumes the existence of a periphery of the Self-Incrimination Clause which protects a person against incrimination not only against past or present transgressions but which supplies insulation for a career of crime about to be launched. We cannot give the Self-Incrimination Clause such an expansive interpretation." (*Id.* at pp. 606-607 [28 L.Ed.2d at p. 361].)

In rationalizing this result with *Marchetti*, the *Freed* court said, "[b]ut the claimant is not confronted by 'substantial and "real"' but merely 'trifling or imaginary hazards of incrimination'—*first* by reason of the statutory barrier against use in a prosecution for prior or concurrent offenses, and *second* by reason of the unavailability of the registration data, as a matter of administration, to local, state, and

other federal agencies. [Citing *Marchetti.*] Since the state and other federal agencies never see the information, he [the claimant] is left in the same position as if he had not given it . . . ." (*United States* v. *Freed, supra*, 401 U.S. 601, 606 [28 L.Ed.2d 356, 361].)

The rule which we deduce from these authorities is that availability of the privilege turns upon the degree, imminent or remote, of the *likelihood* of the claimant's undergoing punishment[4] following conviction based upon answers to the interrogatories.

Here the threat of prosecution is not "trifling" or "imaginary" as was true in *United States* v. *Freed, supra*, 401 U.S. 601. In *Freed*, neither the photos nor the fingerprints were available to other local, state, or federal agencies. In the case now before us, however, the information gathered by the civil division of the district attorney's office could easily be delivered to the criminal division of that same office. More importantly, in contrast to *Freed*, the present case does not involve some imaginary future crime. We are concerned here with possible criminal activity rooted in petitioners' past and current behavior, which could provide the predicate for a finding of criminal intent under section 270. In other words, while actual prosecution might lie in the future, the *threat* of such prosecution, and the incriminating behavior which forms the basis of that threat, dwell in the present.

E.

Reflecting the foregoing analysis, it is our view that the answers to the interrogatories, if given, would expose petitioners to the imminent likelihood of being punished for failing to provide support for their children. As a consequence, petitioners' claim of privilege against self-incrimination was properly raised, and the trial court erred in making its unconditional order that the interrogatories be answered.

II

We now address the policy question of whether the petitioners should nevertheless be compelled to divulge the information.

---

[4]We use the word "punishment" advisedly, for the purpose of the privilege is not to prevent compulsory disclosure of criminal conduct, but to protect against punishment. (See Model Code of Evidence, rule 202 and com.; McCormick on Evidence (1972) § 133, p. 284; 8 Wigmore on Evidence, § 2279, and *Ex parte Cohen* (1894) 104 Cal. 524, 528 [38 P. 364].)

## A.

Having recognized the propriety of the claim of privilege, it is next appropriate to inquire if there is a procedure available here to insulate petitioners from later prosecution and punishment where they have rightfully claimed the privilege but are nevertheless compelled to respond.

This brings us to the subject of use immunity. Such a procedure is recognized and well established in this state. The proposition was the subject of extended discussion in *People* v. *Superior Court* (*Kaufman*) (1974) 12 Cal.3d 421 [115 Cal.Rptr. 812, 525 P.2d 716]. In *Kaufman*, after alluding to earlier restricted views on resort to the procedure, the Supreme Court said, "In more recent years we have given a liberal construction to legislation which purports to relieve an alleged wrongdoer of the threat of criminal prosecution in exchange for incriminating information which the Legislature has deemed to serve some socially desirable policy. Thus, in *Byers* v. *Justice Court* (1969) 71 Cal.2d 1039 . . . we held that although there was no explicit statutory authorization for a grant of immunity when disclosure of incriminating information was compelled by a driver involved in a 'hit and run' accident (*id.* at p. 1050), we could, nevertheless, judicially impose restrictions on the use of such evidence. . . . The statutory authorization for the grant of immunity in *Byers* was deemed to be implicit in the legislation which compelled disclosure, as such legislation would otherwise be rendered impotent.

"We were persuaded in part to the conclusion in *Byers* that authorization existed for the judicial grant of use immunity by United States Supreme Court decisions which deem it to be 'imperative to effect an accommodation that will permit government to collect vitally needed information without impairing the purposes of the privilege' against self-incrimination. [Citations.] Review of the Supreme Court decisions cited in *Byers* (*Byers* v. *Justice Court, supra*, 71 Cal.2d 1039, 1050-1053) suggested 'a form of accomodation which provides the appropriate resolution of the conflicting interests involved in the present case. In brief, those decisions provide (1) that the state may require a person to disclose information otherwise subject to a claim of privilege if in place of the protection conferred by the privilege there is substituted another protection having the same scope and effect as the privilege, namely, immunity from use of the information or its fruits in connection with a criminal prosecution against the person; and (2) that, when

consistent with both legislative intent and the effective enforcement of the criminal laws, a court may hold that such immunity exists, and therefore that disclosure is required, *despite the absence of any specific legislative grant of immunity.'* (*Id.* at p. 1049, italics added.)

"It was concluded in *Byers* that as the imposition of use restrictions would not (1) frustrate any apparent legislative purpose behind the 'hit and run' statute, (2) unduly hamper criminal prosecutions of drivers involved in such accidents, or (3) preclude the Legislature from overriding the judicial grant of immunity if it wished to do so (*id.* at p. 1056), the court was authorized to grant immunity and impose a proper use limitation·without infringing constitutional rights against self-incrimination and notwithstanding the absence of any specific legislative authorization. (Accord, *Bailey* v. *Superior Court* (1970) 4 Cal.App.3d 513....)" (*Id.* at pp. 427-428.)

In *Kaufman*, the Supreme Court.went on to hold that resort to the device of use immunity in the face of a claim of privilege against self-incrimination was appropriate and issued a peremptory writ accordingly. In so doing it stated that, "It is manifest that a grant of immunity with a proper protective order [fn. omitted] would not ... unduly hamper the prosecution of persons who, in the judgment of the authorities, should be subjected to criminal proceedings.... We thus conclude that pursuant to said code section [§ 2019] the respondent court is vested with jurisdiction to issue an appropriate protective order." (*Id.* at pp. 428-429.)

■ From the foregoing, we conclude in turn that *Kaufman* stands for the proposition that the trial court, without the benefit of express statutory authorization, can issue a protective order under Code of Civil Procedure section 2019, granting use immunity to a person who is being compelled to submit to discovery in the face of possible self-incrimination. Such a conclusion is confirmed by the holdings in *People* v. *Superior Court* (*Taylor*) (1975) 53 Cal.App.3d 996, 999 [126 Cal.Rptr. 297], and more recently by the Supreme Court in *Daly* v. *Superior Court, supra,* 19 Cal.3d 132, 147.

### B.

■ The next question to be faced is whether the case before us represents the proper occasion to proceed as the Supreme Court did in *Kaufman.*

Turning first to the objective apparent behind the statutory action in which the discovery question now before us arose, the Legislature, in adopting section 11350 of the Welfare and Institutions Code, has undertaken to cope with a scandalous and continuing imposition upon the state's taxpayers. It is common knowledge, even beyond the necessity to take judicial notice, that the largest categorical public assistance program in operation in California is that accorded to families with dependent children (AFDC). It is in keeping with our compassionate society (the amounts which Americans contribute voluntarily to charity each year outstrip every other country on earth) that innocent children should not become the victims of economic suffering; hence the Burton-Miller Act. On the other hand, the beleaguered California taxpayer is fairly entitled to a vigorous public effort to shift the financial burden of the AFDC program back to where it belongs, namely on the shoulders of those persons who have begotten the innocents whom AFDC must succor; hence section 11350 of the Welfare and Institutions Code.

Once the county, through its welfare department, has extended financial aid in the form of AFDC to a particular family, the district attorney, by statute, "shall take appropriate action pursuant to this section in the superior court of the county which provided aid under this chapter" to enforce the absent, noncustodial parent's obligation to the county for the money paid out to support that parent's child.

As has obviously been demonstrated by the experience of the district attorney, the mere filing of a complaint followed by service upon the alleged fathers has not fulfilled the statutory mandate of "appropriate action." More particularly, as demonstrated by the day-to-day experience of the district attorney's office, because many of the mothers who apply for AFDC are uncertain about the identity of the fathers of their children, and because they therefore have little if any information about the alleged father's ability to pay, a resort to interrogatories has been essential to develop the necessary evidence to reduce the complaints to judgment.

Otherwise, the sheer volume of these cases further demonstrates the need for the legislation mandating them. During fiscal 1976-1977 there were 1,585 civil paternity actions filed by the district attorney in Orange County. In this same period $4,381,497.80 was collected in support funds through the efforts of the district attorney's office. In view of these numbers, it is evident beyond any reasonable basis for dispute that every effort and device should be relied upon to facilitate the pur-

poses for the enactment of section 11350 of the Welfare and Institutions Code. Accordingly, in our view this is an urgent situation crying out for application of the rule announced in *Kaufman*.

## DISPOSITION

Let a peremptory writ of mandate issue to the respondent court directing it to vacate its orders in the three cases here involved granting the district attorney's motion for an order to compel answers to interrogatories. Let said writ further provide, should the district attorney again elect to move for an order to compel answers to the interrogatories, that such motion be granted on condition nevertheless that the order to compel answers include an adequate protective order pursuant to section 2019, subdivision (b)(1) of the Code of Civil Procedure, insulating each petitioner from the use of any information, disclosed by said answers or their fruits, in connection with any criminal prosecution later brought against them.

The alternative writ is discharged; all parties shall bear their own costs.

Kaufman, Acting P. J., and Morris, J., concurred.