Filed 11/13/25  P. v. Eriz CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>MARCUS ANTHONY ERIZ,<br><br>    Defendant and Appellant. | G064049<br><br>(Super. Ct. No. 21CF1703)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Richard M. King, Judge. Affirmed.

William Paul Melcher, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal and Arlyn Escalante, Deputy Attorneys General, for Plaintiff and Respondent.

\*        \*        \*

Defendant Marcus Anthony Eriz shot at another car on the freeway after a dispute with the driver. The shot entered through the trunk of the other car, killing Aiden Leos in the backseat. Eriz was convicted of second degree murder based on a theory of implied malice. On appeal, Eriz argues (1) the evidence was insufficient to support his conviction of implied malice murder; and (2) the trial court erred in failing to instruct the jury that the actus reus of implied malice murder must involve a "high degree of probability that it will result in death." We disagree and affirm the judgment.

FACTS

On the morning of May 21, 2021, Joanna C. was driving northbound on the 55 freeway to take her six-year-old son Aiden to school. Aiden was in the backseat of the car in a child safety seat. Driving in the carpool lane, Joanna C. saw a white Volkswagen approaching very quickly from behind. The white car swerved out of the carpool lane, abruptly drove back into the carpool lane in front of Joanna C.'s car and braked. Joanna C. was scared and concerned because of the white car's sudden movement. Joanna C. observed that a woman was driving the car, and a man was in the front passenger seat.

As Joanna C. merged out of the carpool lane, she drove next to the Volkswagen. Joanna C. gestured to the driver with her middle finger as she continued to merge into the right lanes of the freeway. The male passenger smiled.

A moment later, Joanna C. heard a loud noise, which sounded like a "big rock" had hit her car. Aiden said, "Ow." Joanna C. looked to the rear seat and saw Aiden's head hanging down. She immediately pulled over to the side of the freeway and attempted to get her son out of his car seat.

2

Raul A. was also driving northbound on the 55 freeway and witnessed an interaction between the two cars in front of him. Raul A. saw the driver of a white car "cut off" Joanna C. and then apply the brakes in front of her. Raul A. then saw Joanna C. drive next to the white car, roll down her window, and give the "middle finger" to the driver of the white car. As Joanna C. merged to the right lane, Raul A. saw the male passenger in the white car pull out a gun and fire a single shot at Joanna C.'s car. Raul A. took a photo of the white car. He followed the white car but lost sight of it as it sped off. After he arrived at work, a coworker called 911.

An off-duty police officer stopped to assist Joanna C. and Aiden. The officer noticed blood on Aiden's shirt and observed what appeared to be a gunshot wound. He performed CPR, but Aiden was already dead. Joanna C.'s 911 call was played for the jury.

California Highway Patrol Investigator Kevin Futrell arrived at the scene. Futrell closed the 55 freeway south of where the shooting occurred, and he and other officers walked the freeway for evidence. No bullet casing or projectile was found. Futrell interviewed Raul A., who provided the photo of the white Volkswagen. However, the photo did not show the license plate of the car. Futrell also interviewed Joanna C., who, with the help of the Orange County Sheriff's Department, produced a sketch of the two people in the Volkswagen.

Futrell created a police bulletin with a picture and description of the Volkswagen. Citizens created a banner and website asking "'Who Shot Aiden?'" Futrell and another investigator canvassed the area for security camera footage and obtained a video of a 2019 Volkswagen Golf SportWagen, which they believed was the vehicle involved in Aiden's shooting.

Futrell determined that Wynne Lee, Eriz's live-in girlfriend, was the registered owner of the car seen in the security video. Lee and Eriz were both arrested. The Volkswagen was found in Eriz's grandmother's garage.

Futrell separately interviewed Lee and Eriz at the police station. Eriz admitted to committing the shooting. He always had his gun with him because he felt that people had become more hostile on the road. He was not "mad" when he fired the gun, and when asked whether he aimed at Joanna C.'s car, he replied, "'I didn't even take a second to aim.'" The gun was already loaded but he had to rack it and roll down the window before shooting. Eriz admitted that he pointed the gun at the car "and popped it off." He took a gun safety test as part of the registration requirement for his gun and stated he had also fired a rifle in the past. He knew there was a high likelihood that pointing the gun at a car could kill someone, but he still shot at Joanna C.'s car.

Police recovered Eriz's gun, a Glock 17 pistol, from a toolbox at his place of work. The gun had a 10-round magazine, which was loaded with nine-millimeter rounds. The gun had aftermarket modifications to the grip and magazine release pin.

A forensic expert who analyzed Joanna C.'s car observed an apparent bullet hole in the trunk lid with corresponding bullet holes in the interior of the trunk and through the right rear passenger seat. Trajectory rods were used to trace the path of the bullet. The expert testified the bullet entered from the left side exterior of the trunk through to the right rear passenger seat. Police did not recover any bullets from inside the car or from Aiden's body.

A jury found Eriz guilty of second degree murder (Pen. Code, § 187, subd. (a))[1] and shooting at an occupied vehicle (§ 246). The jury also found true the allegation that, in the commission of the murder, Eriz used a firearm causing great bodily injury or death (§ 12022.53, subd. (d)). The trial court sentenced Eriz to a term of 40 years to life in state prison.

DISCUSSION

I.

SUFFICIENCY OF THE EVIDENCE

Eriz argues the evidence adduced at trial was insufficient to support his conviction for second degree implied malice murder. We find the evidence sufficient and affirm the judgment.

A.    *Legal Standard*

In reviewing the sufficiency of the evidence, we must "'review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'" (*People v. Wolfe* (2018) 20 Cal.App.5th 673, 681.) "It is the jury, not an appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt." (*Ibid.*) "The appellate court may not substitute its judgment for that of the jury or reverse the judgment merely because the evidence might also support a contrary finding." (*Ibid.*)

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).) When a person commits a murder without premeditation and deliberation, it is of the second degree. (§ 189.) In a second

_____

[1] All further statutory references are to the Penal Code.

degree murder, the "malice may be express or implied." (§ 188.) "The primary difference between express malice and implied malice is that the former requires an intent to kill but the latter does not." (*People v. Soto* (2018) 4 Cal.5th 968, 976.) Implied malice murder requires the killing be proximately caused by an act, "'"'the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life."'"' (*People v. Reyes* (2023) 14 Cal.5th 981, 988.) The defendant's conduct before and after an attack may be considered in determining whether the requirements have been satisfied. (*People v. Cravens* (2012) 53 Cal.4th 500, 511.) Implied malice may be proven by circumstantial evidence. (*People v. Superior Court (Valenzuela)* (2021) 73 Cal.App.5th 485, 502.)

B.    *Analysis*

The evidence adduced at trial was sufficient to convict Eriz of second degree implied malice murder. The "natural consequence" of shooting a gun at an occupied car is that a bullet may strike someone inside. Eriz admitted during his police interview that he knew there was a high probability that shooting out of the window at another car on the freeway would lead to the death of someone in that car, yet he did so anyway. Additionally, Eriz's actions after the shooting, including fleeing the scene of the crime and hiding the car in his grandmother's garage, are further evidence that he knew there was a high probability someone had been injured or killed. (See *People v. Paysinger* (2009) 174 Cal.App.4th 26, 29, quoting CALCRIM No. 372 ["'If the defendant fled or tried to flee immediately after the crime was committed, that conduct may show that he was aware of his guilt'"].)

6

Eriz argues he should not have been convicted of second degree implied malice murder because he did not know Aiden was in the car nor did he intend to kill him. However, Eriz knew Joanna C. was driving the car and that she likely had at least one passenger because she had been driving in the carpool lane right before the shooting. By shooting a gun at Joanna C.'s car, Eriz acted with conscious disregard for her life, as well as the lives of any of her passengers, like Aiden.

## II.

### INSTRUCTIONAL ERROR

Eriz argues the trial court erred in failing to instruct the jury that, to find him guilty of implied malice murder, the natural and probable consequences of his action must involve "a high degree of probability that it will result in death." Eriz also contends this alleged failure to properly instruct the jury violated his state and federal constitutional rights to due process and a fair trial. We conclude that the trial court properly instructed the jury, and Eriz's due process rights were not violated.

A.     *Factual Background*

The prosecutor argued in closing that "[t]he People have to prove that the natural and probable consequences of pointing a loaded gun at someone and pulling the trigger is dangerous to human life." The prosecutor later told the jury, "[i]t's for you to decide if a loaded Glock 17 pointed and fired at a little boy is dangerous to human life." The prosecutor asked, "who doesn't know firing a gun at someone is deadly?" The prosecutor argued to the jury Eriz "was aware of the danger because of what he knows about the firearm. Did he disregard it? He ignored it. He knew and understood the danger and he did it anyway. That's what the People have to prove."

7

The trial court instructed the jury with former CALCRIM No. 520 regarding second degree murder with malice aforethought:

"The defendant is charged in Count one with murder in violation of Penal Code section 187. [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] [1.] The defendant committed an act that caused the death of another person; [¶] AND [¶] 2. When the defendant acted, he had a state of mind called malice aforethought. [¶] There are two kinds of malice aforethought, express malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder. [¶] The defendant had *express malice* if he unlawfully intended to kill. [¶] The defendant had *implied malice* if: [¶] 1. He intentionally committed the act; [¶] [2.] The natural and probable consequences of the act were dangerous to human life; [¶] 3. At the time he acted, he knew his act was dangerous to human life; [¶] AND [¶] 4. He deliberately acted with conscious disregard for human life. [¶] Malice aforethought does not require hatred or ill will toward the victim. It is a mental state that must be formed before the act that causes death is committed. It does not require deliberation or the passage of any particular period of time. [¶] If you find the defendant guilty of murder, it is murder of the second degree."

The jury was also instructed with CALCRIM No. 580 regarding the lesser included offense of involuntary manslaughter:

"When a person commits an unlawful killing but does not intend to kill and does not act with conscious disregard of human life, then the crime is involuntary manslaughter. [¶] The difference between other homicide offenses and involuntary manslaughter depends on whether the person was aware of the risk to life that his or her actions created and consciously disregarded that risk. An unlawful killing caused by a willful act done with

8

full knowledge and awareness that the person is endangering the life of another, and done in conscious disregard of that risk, is voluntary manslaughter or murder. An unlawful killing resulting from a willful act committed without intent to kill and without conscious disregard of the risk to human life is involuntary manslaughter."

## B.   Legal Standard

We review claims of instructional error de novo. (*People v. Cole* (2004) 33 Cal.4th 1158, 1210.) "'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.'" (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1112.) "'"[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction."'" (*People v. Musselwhite* (1998)17 Cal.4th 1216, 1248.) "'"The absence of an essential element in one instruction may be supplied by another or cured in light of the instructions as a whole."'" (*People v. Castillo* (1997) 16 Cal.4th 1009, 1016.)

In determining whether an instruction is ambiguous or misleading, the court considers "the specific language challenged, the instructions as a whole and the jury's findings," as well as counsel's closing arguments to determine whether the instructional error "would have misled a reasonable jury." (*People v. Cain* (1995) 10 Cal.4th 1, 36, 37.).

Reversal is not required unless it is reasonably likely the jury misunderstood and misapplied the court's instructions to the defendant's detriment. (*People v. Smithey* (1999) 20 Cal.4th 936, 963–964.) A trial court's failure to instruct the jury on all elements of an offense is a constitutional error "subject to harmless error analysis under both the California and United States Constitutions." (*People v. Flood* (1998) 18 Cal.4th 470, 475.)

9

*C.* *Analysis*

Eriz contends the trial court had a sua sponte duty to instruct the jury that implied malice murder requires that the actus reus of the crime involves a high degree of probability of death, relying on *People v. Reyes* (2023) 14 Cal.5th 981, 989 (*Reyes*).

Our Supreme Court rejected this argument in *People v. Nieto Benitez* (1992) 4 Cal.4th 91, 110–111 (*Nieto Benitez*) and *People v. Knoller* (2007) 41 Cal.4th 139, 157 (*Knoller*). The defendant in *Nieto Benitez* argued that CALJIC No. 8.31, a pattern jury instruction predating CALCRIM No. 520, "misstate[d] the law because the instruction omit[ted] a requirement that defendant commit the act with a *high probability* that death will result." (*Nieto Benitez*, *supra*, at p. 111.) The Supreme Court disagreed, noting it had previously concluded in *People v. Watson* (1981) 30 Cal.3d 290, 300 "that the two linguistic formulations—'an act, the natural consequences of which are dangerous to life' and 'an act [committed] with a high probability that it will result in death' are equivalent and are intended to embody the same standard." (*Nieto Benitez*, at p. 111.)

In *Knoller*, the trial court granted a new trial to a defendant convicted of second degree implied malice murder, finding the evidence was insufficient to show the defendant subjectively knew her conduct involved a high probability of death. (*Knoller*, *supra*, 41 Cal.4th at p. 142.) The Supreme Court disagreed, holding that the correct standard for implied malice murder "requires proof that a defendant acted with conscious disregard of the danger to human life." (*Id.* at p. 156.)

In relying upon *Reyes* to argue that the jury should have been instructed that the act must involve a high degree of probability of death, Eriz seems to argue that *Reyes* overruled *Nieto Benitez* and *Knoller*. We

10

disagree. In *Reyes*, the court was reviewing a trial court's denial of a petition for resentencing under section 1172.6. The Supreme Court concluded there was insufficient evidence to support a theory that the defendant was guilty of murder as a direct perpetrator who harbored implied malice. (*Reyes*, *supra*, 14 Cal.5th at p. 989.) The court based its decision primarily on the lack of substantial evidence of proximate cause, but it also disagreed with the trial court's conclusion that the defendant's conduct was dangerous to human life. As our Supreme Court explained: "To suffice for implied malice murder, the defendant's act must not merely be dangerous to life in some vague or speculative sense; it must "'involve[ ] a high degree of probability that it will result in death."'" (*Ibid.*) The Supreme Court held that the defendant's act of traveling to rival gang territory with other gang members did "not by itself give rise to a high degree of probability that death will result." (*Ibid.*)

*Reyes* did not involve an alleged erroneous jury instruction, and the court did not suggest either *Nieto Benitez* or *Knoller* was wrongly decided. The *Reyes* court's reference to the "high probability of death" standard in deciding a sufficiency of the evidence question under section 1172.6 does not mean trial courts must include such language in the jury instructions defining implied malice. (*Reyes*, *supra*, 14 Cal.5th at pp. 989–990.) Nor did *Reyes* call into question the Supreme Court's own prior holdings that the "high probability" and "natural consequences" standards of implied malice are the same, or that instruction solely on the "natural consequences" standard is sufficient. (*Nieto Benitez*, *supra*, 4 Cal.4th at p. 111.) Because the Supreme Court in *Reyes* did not decide this issue and did not overrule or otherwise disapprove of its own precedent, we remain bound by the decisions in *Nieto Benitez* and *Knoller*. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

11

The fact that the Judicial Council Advisory Committee revised CALCRIM No. 520 in March 2024, after Eriz's trial, to include the "high degree of probability" definition in the objective component element of implied malice does not affect our determination the jury instruction was proper as given. Pattern jury instructions "are not themselves the law, and are not authority to establish legal propositions or precedent." (*People v. Morales* (2001) 25 Cal.4th 34, 48, fn. 7.) Here, the court appropriately used the jury instructions available at the time of trial, which contained a correct statement of the definition of implied malice. As noted, nothing in *Reyes* suggests the Supreme Court intended to overturn precedent which established that the "high probability" and "natural consequences" standards are equivalent.

Eriz also contends CALCRIM No. 520 violated his state and federal rights to due process because it did not define the necessary actus reus as requiring a "high degree of probability that it would result in death." We disagree. An alleged "ambiguity, inconsistency or deficiency in a jury instruction" does not "rise[] to the level of a due process violation" unless the ""ailing instruction . . . so infected the entire trial that the resulting conviction violates due process."" (*People v. Adams* (2009) 176 Cal.App.4th 946, 953.) Here, instructing the jury with CALCRIM No. 520, which properly stated the legal standard for second degree implied malice murder, did not "so infect[] the entire trial" as to violate Eriz's due process rights. Nor did the jury instruction, when considered in the context of the trial record as a whole, render Eriz's trial so fundamentally unfair as to violate his right to due process. (*People v. Foster* (2010) 50 Cal.4th 1301, 1335 [in determining whether a jury instruction violated a defendant's right to due process, the ""instruction "may not be judged in artificial isolation," but must be

12

considered in the context of the instructions as a whole *and the trial record*"]; *Salas v. Cortez* (1979) 24 Cal.3d 22, 27 ["The touchstone of due process is fundamental fairness"].)

Nor, as Eriz claims, did CALCRIM No. 520 lessen the prosecution's burden to demonstrate his guilt beyond a reasonable doubt. The jury was instructed that it had to find "the natural and probable consequences of the act were dangerous to human life." Thus, the prosecution still had to meet its burden of proof to demonstrate that the natural and probable consequences of Eriz's shooting at Joanna C.'s car were dangerous to human life.

## DISPOSITION

The judgment is affirmed.

BANCROFT, J.*

WE CONCUR:

SANCHEZ, ACTING P. J.

GOODING, J.

*Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.